IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x

**GOLDENEYE ADVISORS, LLC**
201 South Phillips Ave.
Sioux Falls
South Dakota, 57104


                                          *Plaintiff,*

v.

**HANACO VENTURE CAPITAL, LTD**.
15 West 26th Street, 9th Floor          Case No. _____
New York, NY, 10010

**LIOR PROSOR**
15 West 26th Street, 9th Floor
New York, NY, 10010

**DAVID FRANKEL**
15 West 26th Street, 9th Floor
New York, NY, 10010



                                          *Defendants.*
--------------------------------------------------------------------x


## COMPLAINT

## INTRODUCTION

1. This lawsuit seeks to hold Defendants – a venture capital firm and its executives – liable for their fraudulent and, at the very minimum, gross negligent conduct in solicitating and managing Plaintiff's $1 million investment which Defendants put into the now defunct Israeli-based startup, Vesttoo, Ltd.

2. As it turned out, Vesttoo's entire business model and "success" was based on one of the biggest fraudulent enterprises in the last twenty years, leading some to describe it as the "Madoff" of insurance schemes.

3. Although the investigation(s) is still unfolding, it is now clear that Vesttoo's illusory success was structured on essentially one (!) customer, a Chinese "investor," a fact that was intentionally concealed from Plaintiff by Defendants.

4. To make matters worse, Vesttoo's top management and executives were involved in creating fake letters of credit that were ostensibly issued from the China Construction Bank on behalf of the above-mentioned Chinese "investor" in the amount of almost U.S. $3 billion (!), over 70 percent of Vesttoo's total cited transactions.

5. How Defendants – ostensibly a well-known and respected venture capital firm and its executives– did not pick up on any of this is nothing more than astounding. Certainly, an unsophisticated investor would question the viability of a business model based essentially on one customer, and a shady one at that.

## PARTIES

6. Plaintiff Goldeneye Advisors, LLC ("**Goldeneye**") is a limited liability company organized under the laws of the State of South Dekota, having its designated office and business address at 201 South Phillips Ave., Sioux Falls, South Dakota, 57104. Goldeneye is managed by Ilan Goldstein ("**Goldstein**").

7. Defendant Hanaco Venture Capital, Ltd. ("**Hanaco**" or "**Hanaco Ventures**") is a corporation organized under the laws of the State of Israel, having headquarters at 6 David Elazar St., Tel Aviv, Israel, 6107402 and 15 West 26th Street, 9th Floor, New York, NY, 10010.

8. Defendant Lior Prosor ("**Prosor**") is a citizen and resident of New York and a co-founder of Hanaco.

9. Defendant David Frankel ("**Frankel**") is a citizen and resident of New York and is a vice president and partner at Hanaco.

## SUBJECT MATTER JURISDICTION

10. This Court has subject matter jurisdiction over this action under 28 U.S.C. §1331 as this lawsuit asserts a cause of action under federal law (Count I), *i.e.*, a cause of action under Rule 10b-5, promulgated under Section 10(b) of the Exchange Act of 1934, codified at 15 U.S.C. §78j. This Court also has subject matter jurisdiction over Plaintiff's common law counts (Counts II and III) under 28 U.S.C.§1367, inasmuch as Counts II and III arise out of the same transaction and events that give rise to Count I.

11. This Court also has jurisdiction under 28 U.S.C. §§1332(a)(1) and (2) because the claims in this action are between Plaintiff Goldeneye, a South Dakota LLC, deemed a citizen of California for purposes of diversity jurisdiction,[1] and Defendants who are citizens of New York (*i.e.*, Defendants Prosor and Frankel) and Israel (*i.e.*, Hanaco).

## **VENUE**

12. Venue is proper under 28 U.S.C. §1391(b) because Defendants do business in this District, maintain an office in this District, and their affiliations with this District are continuous and systematic and a substantial part of the events or omissions giving rise to this dispute which occurred in this District.

---

[1] A limited liability company is deemed to be a citizen of each state of which its members are citizens. *See, e.g.*, *Handelsman v. Bedford Vill. Assocs. L.P.*, 213 F.3d 48, 51-52 (2d Cir. 2000). Goldeneye has one member, the Goldilocks Family Trust. For purposes of diversity jurisdiction, the citizenship of a trust like the trust here, is determined by the citizenship of its trustee. *Raymond Loubier Irrevocable Tr. v. Loubier*, 858 F.3d 719, 729, 731 & n.8 (2d Cir. 2017); *see also Quantlab Fin., LLC, Quantlab Techs. Ltd. (BVI) v. Tower Rsch. Cap., LLC*, 715 F. Supp. 2d 542, 548 (S.D.N.Y. 2010). The trustee of the Goldilocks Family Trust is the South Dakota Trust Company, LLC ("SDTC"), a South Dakota company. SDTC, in turn, also has one member, TC3 Group Holding, LLC, a Delaware company ("TC3"). TC3 is also a single member entity, owned by JTC Americas TrustCo Holdings, LLC, a Delaware entity ("JTC"). JTC is wholly owned by JTC USA Holdings, Inc., a California corporation having its principal place of business at 99 Almaden Boulevard, Suite 875 San Jose, Ca 95113. Hence, Plaintiff is a citizen of California for purposes of §1332.

### THE FACTS GIVING RISE TO PLAINTIFF'S CLAIMS

**A. Hanaco Ventures is established and makes an initial investment in Vesttoo**

13. Defendant Hanaco Ventures was established in 2017 by Alon Lifshitz, Pasha Romanovski ("**Romanovski**"), and Defendant Prosor.

14. According to its website ([www.hanacovc.com](www.hanacovc.com)):

> Dually headquartered in NYC and Tel Aviv, Hanaco partners with tenacious early- and growth-stage tech entrepreneurs, empowering them to reimagine their industries and make a profound impact on the world.
>
> Whether you need seed funding for a great idea or you've reached an inflection point and need capital to scale, we'll unlock the funding, strategy, resources, and connections you need to open doors and accelerate growth.

15. The primary objective of Defendant Hanaco Ventures is to generate significant returns for its partners and investors, principally through long-term capital appreciation, by making, holding and disposing of privately negotiated equity and equity-related investments, principally but not limited to, Israeli and Israel-related technology companies.

16. Defendant Hanaco Ventures, through its various subsidiaries, offshore companies and affiliated partnerships, invests in Israeli-based startup companies in various technological sectors.

17. To carry out its purpose, Defendant Hanaco Ventures routinely approaches and solicits investments by third parties to invest in Hanaco's various

subsidiaries and affiliates ("**Funds**"). These Funds, in turn, invest in the actual target company.

18. A typical Hanaco-based investment looks something like this: A representative of Defendant Hanaco reaches out to a potential investor to evaluate if the investor is interested in participating in investing in a promising Israeli startup company, via Hanaco or through one of its Funds. The representative also sends promotional materials to the investor prepared by Hanaco and the target company. If the investor shows an interest in making an investment, discussions will continue until, ultimately, the investor is prepared to send money to Hanaco. A representative of Hanaco will then reach out to the investor and instruct the investor where to wire the investment funds. The investor is usually instructed to send the money to a Fund (as defined above).

19. These Funds generally take the form of a limited partnership organized under the laws of the jurisdiction where the Funds are located. An investor who agrees to transfer money to a Fund will usually also execute a subscription agreement to purchase interests in the Fund and a limited partnership agreement.

20. Upon information and belief, the Fund will then use the pool of money it has solicited to invest in the target Israeli company.

21. One such Israeli startup company that Defendant Hanaco Ventures had taken a keen interest shortly after it was established is an Israeli startup company called Vesttoo, Ltd. ("**Vesttoo**"). Vesttoo

> specializes in data-driven risk management solutions for the P&C [property and casualty insurance] and longevity markets.

> www.hanacovc.com/companies/vesttoo.

22. According to Hanaco Ventures' website:

> Vesttoo is the world's first marketplace for non-catastrophe insurance-based risk transfer and investments. Their proprietary AI-based technology facilitates risk transfer between insurance companies and institutional investors, providing insurance-linked investments to asset managers of all types while enhancing risk transfer and liquidity in the Life and P&C insurance markets.

> (www.hanacovc.com/companies/vesttoo) [this material, as well as the material in ¶21 has been subsequently removed from Hanaco's website. The page has been preserved by Plaintiff].

23. Defendant Hanaco first invested in Vesttoo in or around August 2021, leading the "Series A" funding round. *See* Marina Povolotsk, *Vesttoo Raises $6 Million Series A Round Promoting the Growth of Multi-Billion Dollar Insurance-Linked Program*, INSURETECH ISRAEL NEWS (August 10, 2021), available here.

24. At the time, Romanovski, co-founder and partner of Defendant Hanaco, was quoted in multiple media outlets as stating:

> Vesttoo is disrupting the reinsurance industry. The company is building a digital marketplace and has already proven its ability to sign multi-year contracts with leading US and EU insurance and reinsurance providers. Hanaco Ventures chose to invest in Vesttoo because of the unique solution and the company's impressive founding team who will have a big impact in this untapped sector.

25. The "Series A" investment was done through one of Hanaco's Funds, a Cayman Island limited partnership known as Hanaco II, L.P.  As a result of the investment, Romanovski was appointed as a director in Vesttoo and has held that position during the entire duration of the relevant time period of this lawsuit, 2021-2023.[2]

26. Goldstein took part in this round of investment through another entity under his control by providing funds to Hanaco II, L.P. to be invested in several Israeli start-ups, not just Vesttoo. This investment is **not** at issue in this lawsuit.

## B. Defendant Hanaco solicits money from Plaintiff to invest exclusively in Vesttoo

27. Approximately one year after its initial investment in Vesttoo, in the spring of 2022, Defendant Hanaco sought additional cash from investors, including the Plaintiff. At that time, Hanaco Ventures wanted to invest $20 million in Vesttoo as part of a $80 million "Series C" round led by Mauro Capital at a $1 billion post-money valuation (the "**Vesttoo Investment**" or "**Series C Investment**"). *See* Manya Saini, *Vesttoo valuation more than triples to $1 billion after latest funding*, REUTERS (Oct. 25, 2022) ("The series C round drew investments from venture capital firms Mouro Capital, Gramercy Ventures, Black River Ventures and Hanaco Ventures.").

---

[2] According to Vesttoo's Articles of Association, §70, "[t]he number of the members of the Board shall not be less than two (2) and shall not exceed Five (5) directors." When Romanovski became a director in August 2021, Vesttoo's board consisted of the following additional four individuals: (1) Yaniv Bartela, (2) Ben Zickel, (3) Alon Lifshitz (not the same Lifshitz as described above), and (4) Ami Barlev.

28. To that end, throughout the spring of 2022, representatives and executives of Defendant Hanaco reached out to Goldstein and began soliciting additional capital to be used for investing **exclusively** in Vesttoo.

29. On or around March 22, 2022, Defendant Frankel spoke with Goldstein in connection with the Vesttoo Investment for the purpose of soliciting the additional investment. On that same day, Frankel sent Goldstein, via email, solicitation materials regarding this additional investment in Vesttoo.

30. Upon information and belief, Defendant Prosor was aware of Frankel's discussions with Goldstein and supervised Frankel during the various stages of these discussions.

31. The email used by Frankel was david@hanacovc.com and it contained a signature of Frankel, with the *Hanaco* insignia, and described Frankel as "vice president."

32. These materials – including a PowerPoint presentation prepared and issued by Defendant Hanaco Ventures – contained the following information and representations:

    (a) Statements to the effect that the investor had an opportunity to participate in a $80M investment round in a hyper-growth, category-defining business alongside a major strategic investor, Santander;

    (b) Statements to the effect that Vesttoo is pioneering a new category and growing at unparalleled speed;

    (c) Information regarding Vesttoo's product, as well as an explanation of the business model;

(d) A projected IPO in the first quarter of 2024 with a U.S. $6 billion valuation;

(e) Liquidity scenarios through a strategic M&A or IPO.

33. The promotional material also included the following slide which described the "financial investors" who would receive "alpha returns," including "Retail investors," "HNWI" [high net worth individuals], "Hedge funds," "Pension funds," "Banks," and "Insurers":



34. An additional slide contained further promotional material and, similar to the prior slide, indicated that Vesttoo had a "deep investor network":



35. Towards the end of this PowerPoint presentation, the names of Hanaco's founders appeared: Alon Lifshitz, Romanovski and Defendant Prosor:



36. Upon information and belief, this promotional material was created and prepared by Defendant Hanaco employees, including Defendants Prosor and Frankel, as well as non-parties, Alon Lifshitz and Romanovski.

37. Goldstein reviewed the materials after they were sent. Goldstein also asked acquaintances and trusted friends to review the materials and opine as to the potential profitability of the business model as described in the solicitation materials.

38. On May 2, 2022, a representative of Plaintiff Goldeneye reached out to Defendant Frankel via email and asked for a term sheet for the Vesttoo Investment. Defendant Frankel, via his *hanacovc.com* email, sent the term sheet, entitled *Memorandum of Terms for The Private Placement of Series C Preferred Shares of Vesttoo, Ltd.*, on the same day.

39. Finally, after these several email exchanges, presentations and conversations, Defendants persuaded Plaintiff and its manager to invest (an additional) U.S. $1 million in Vesttoo. Representatives of Defendant Hanaco instructed Plaintiff's manager to transfer the funds to an account

in the name of STL Namos, LP, a limited partnership organized under the laws of the State of Delaware ("Namos").

40. The transfer of funds occurred on or around June 9, 2022.

41. Upon information and belief, Namos is a Hanaco-based Fund, used by Hanaco as vehicle to invest in Israeli startup companies such as Vesttoo.

42. Upon information and belief, the cash wired to Namos by Goldeneye was then transferred to Vesttoo to partially finance the Series C Investment.

43. Shortly afterwords, Plaintiff was instructed to sign a subscription agreement and a limited partnership agreement. (Plaintiff Goldeneye has also commenced arbitration proceedings against Namos in Israel under the aforementioned limited partnership agreement). Defendant Prosor signed the subscription agreement in his capacity as authorized signatory of the general partner of Namos.

## C. Vesttoo (fraudulently) rises and rapidly falls

44. Unbeknownst to Goldeneye and Goldstein at the time of the Series C Investment, the apparent success and promising business model which made Vesttoo so attractive was nothing more than an illusion. Goldeneye – as a result of the Defendants' solicitation – invested in a company that was rotten to the core.

45. To all those who were not insiders, Vesttoo appeared to be a "successful" Israeli-based startup company, employing artificial intelligence to spread the risk of insurance policies and opening the reinsurance market to "**Financial Investors**" (as we define blow). As it turns out, Vesttoo's initial success and, hence, appeal, was based on a major multibillion-dollar fraud

involving fake letters of credit, and shady transactions with Chinese entities perpetrated by Vesttoo's highest management and directors. To better understand the gravity of Defendants' negligence, misconduct, and breach of their fiduciary duties towards Plaintiff, a brief description of Vesttoo's business model is described immediately below.

46. Vesttoo is a fintech platform designed to connect global reinsurance markets with global capital markets for the purpose of financing reinsurance risks. In a conventional reinsurance transaction, an insurance company (sometimes called the "reinsured") transfers to another insurer (called the "reinsurer") a portion of the risk that the reinsured underwrote with respect to certain of its policies, along with a portion of the premium. This risk spreading permits a reinsured to reduce the amount of cash reserves it must hold for the protection of policyholders, and thereby increases its capacity to underwrite additional insurance.

47. The following is an example of a routine Vesttoo platform transaction: as previously mentioned, in a conventional reinsurance transaction, an insurance company partially transfers its risk as a reinsured under a reinsurance agreement with a reinsurer. The reinsurer effectively converts the insurance risk into an investible form of security or ownership interest.

48. Vesttoo claimed to have developed a technological solution to facilitate the transformation of reinsurance agreements into investible securities. In a Vesttoo-facilitated transaction, the reinsurer enters into agreements with Vesttoo entities, such as a shareholder agreement, a cell management agreement, or a subscription agreement. Under these contracts, the

reinsurance agreement is transformed into an equity security in a segregated and protected cell (*i.e.*, a local, juridical entity) created under Bermuda law (the Bermuda Segregated Accounts Companies Act 2000). This equity security is then sold to a Vesttoo entity and results in the Vesttoo entity and a private investor becoming the beneficial owners of the applicable segregated cell and any funds held on account for that entity. In principle, this arrangement allowed for the private investors to participate in the lucrative reinsurance market.

49. Effectively, under this arrangement, private investors serve as reinsurers and receive insurance premiums as part of their investment return. For purposes of this lawsuit, these private investors are referred to as "**Financial Investors**" so as not to confuse them with conventional investors such as Plaintiff.

50. Of course, a Financial Investor must have the capacity to pay in the event of an occurrence that triggers the insurance policy (*e.g.*, an earthquake). To ensure that Financial Investors had the financial capacity to act as reinsurers, as part of the agreements related to the segregated cell-entities described above, Financial Investors were required to provide a collateral security to be posted to support the reinsurer/Financial Investor's financial obligation to the original insurer. That security typically took the form of a letter of credit ("**LOC**") from a financial institution.

51. Moreover, in the event a reinsurer is not licensed in the state in which they have undertaken their reinsurance obligations, those reinsurers are required, as a matter of law, to collateralize their undertakings.

52. The following is a flow chart of a routine Vesttoo reinsurance transaction:



Source: *In re Vesttoo*, 23-11160-MFW, Dkt. No. 118, at 15 (Bkr. Del.)

53. Upon information and belief, Vesttoo created approximately 22 "Vesttoo Bay" partnerships ("**Vesttoo Bay Partnerships**") which served as the vehicles that became the owners of the Bermuda segregated "cell" entities which held the insurance-linked securities. A Vesttoo-affiliate, Vesttoo Holdings, Ltd., served as the general partner of the Vesttoo Bay Partnerships.

54. Vesttoo's "success," however, was illusory and fraudulent. As it turned out, as early as 2021 (or before), Vesttoo founders and upper management, including members of the board of directors, had forged approximately U.S. $4 billion worth of LOCs, purportedly issued by financial institutions. These LOCs formed the foundation upon which the Vesttoo platform was constructed.

55. Moreover, it turned out that Vesttoo never had any "deep investor network" as represented to Plaintiff and its manager by Defendants (*see* ¶34 above). Instead, Vesttoo's "success" was based mainly on an unknown and dubious Chinese company called Yu Po Holdings, Ltd. ("**Yu Po**"). Upon information and belief, Yu Po was an "Financial Investor" and limited partner in each of the 22 Vesttoo Bay Partnerships. Upon information and belief, Yu Po was identified as a "Financial Investor" in or around December 2021, approximately six months after Hanaco made its first investment in Vesttoo and Romanovsky was appointed as a director.



56. Upon information and belief, **since 2020, Vesttoo quoted 96 but closed 65 transactions with collateral totaling $3.932 billion, of which 79% ($3.1 billion) were with Yu Po**. Approximately $586 million were with another Chinese investor called Cheng Yuan Holdings.

57. In these Vesttoo transactions, standby letters of credit were falsely represented by Vesttoo management as having been issued by the following banks: (1) China Construction Bank ("**CCB**"): $2.81 billion; (2) Standard Chartered Bank: $362.5 million; and (3) Santander Bank: $186 million. Of these letters of credit, the banks have confirmed that the vast majority of them were fraudulent.

58. Vesttoo's fraudulent scheme was unveiled on or about July 14, 2023, when an original insurer demanded payment in full under one of the LOCs procured by Vesttoo, issued by CCB. Puzzlingly, CCB denied the insurer's request for payment on the grounds that the LOC had been forged at which time the Vesttoo enterprise rapidly unraveled.

59. Shortly thereafter, Vesttoo filed for Chapter 11 bankruptcy in Delaware, *In re Vesttoo Holdings Ltd.*, No. 23-11175, *petition filed* (Bkr. D. Del. Aug. 15, 2023); internal as well as external investigations commenced, the details of which can be found in the docket of the bankruptcy case; and a plethora of lawsuits concerning the Vesttoo fall out were filed all across the globe.[3]

60. During the course of the bankruptcy proceeding, Vesttoo, as debtor, filed its First Interim Report on September 7, 2023, which summarizes the results of the internal investigation which was initiated by the remaining board members of Vesttoo.[4] *See In re Vesttoo*, 23-11160-MFW, Dkt. No. 118. (the "**Report**" or "**Interim Report**"), available here.

---

[3] The following is a partial list of pending lawsuits that have been filed in the aftermath of the Vesttoo fraud:

1. **Clear Blue Insurance Company et al. v. China Construction Bank, et al.**, 1:24-cv-09247 (S.D.N.Y.)
2. **White Rock Insurance (SAC), Ltd., et al. v. China Construction Bank, et al**., 654432/2024 (N.Y. Sup. Ct.)
3. **Homeowners Of America Insurance Co., et al. v. China Construction Bank, et al**., 1:24-cv-3591 (S.D.N.Y.)
4. **Incline Casualty Co., et al. v. China Construction Bank**, 1:24-cv-4392 (S.D.N.Y.)
5. **Porch.com v. Arthur J. Gallagher & Co. et al**., 3:24-cv-1475 (N.D. Texas)
6. **Clear Blue Insurance Company, et al. v. Aon PLC, et al.** 655987/2023 (N.Y. Sup. Ct.)

[4] After Vesttoo's fraud became public knowledge, Vesttoo fired several key executives and removed Yaniv Bartela and Alon Lifshitz from the board of directors. Upon information and belief, the remaining board members were Romanovski, Ami Barlev and Christopher Gottschalk. *See* above, fn. 2.

**D. Red flags concerning Vesttoo abounded as early as 2021**

61. The Interim Report states that "red flags abounded as early as 2021," with due diligence reports from December 2021 and April 2022 revealing that Hong Kong based Yu Po "had a limited profile for an investor with $3 billion of investment capacity."

62. The Report goes on to state that, "[i]n response, Vesttoo's CFO, Gaurav Wadhwa, noted that "he cannot think of a higher priority task for the company than" further investigation into Yu Po. He further noted that "this issue is existential for us." Similarly, concerns were expressed by others regarding the irregularity of the Yu Po relationship.

63. According to the Report, "[s]ignificant concerns were similarly raised by numerous employees during the onboarding of new investor Cheng Yuan in 2022. These red flags included that Cheng Yuan's KYC questionnaire lacked proof of funds, which seemed highly relevant for a firm committing $1 billion […]".

64. The Report states,

> Perhaps nowhere were these red flags starker than with CCB. Curiously, Vesttoo had one single point of contact, an Assistant Relationship Manager. When a Vesttoo executive asked for confirmation that the actual employees signing the LOCs had actual signing authority for both the Shanghai and New York branches, she was informed that "we will not respond to any further correspondence regarding our clients, and we kindly request that you communicate via Yupo Holdings Ltd and refrain from contacting us directly with any such requests."

65. The Interim Report also states that "Vesttoo made payments to Yu Po totaling $7.88 million, including $3.69 million into accounts in the name of Prime Trust LLC and JC Technologies FL; entities affiliated with Vixipay

18

Ltd., of which Ginati is a partial owner." Upon information and belief, Ehud

Ginati was the Senior Director of Capital Markets at Vesttoo.

### E. **Plaintiff learns of the fraud**

66. Shortly after the Vesttoo fraud went public, Plaintiff began seeing the media reports. No Hanaco employee or executive ever reached out to Plaintiff regarding the matter or even bothered to explain what had occurred.

67. Plaintiff's investment of $1 million had simply evaporated overnight.

### COUNTS

### COUNT I

*Violation of Section 10(b) of the Exchange Act and Rule 10b-5 against all Defendants*

68. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

69. This Count is asserted against Defendants Hanaco, Prosor and Frankel, and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder.

70. The underlying transaction – the solicitation and subsequent purchase by Plaintiff Goldeneye of an interest in Namos, a limited partnership – involved "securities" for purposes of Rule 10b-5. *See SEC v. Aqua-Sonic Products Corp.,* 687 F.2d 577, 581-584 (2d Cir. 1982), *cert. denied,* 459 U.S. 1086 (1982) (limited partnership interest generally is a security because such an interest involves investment "in a common enterprise with profits to come solely from the efforts of others.").

71. Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements described above, which they knew were misleading (or deliberately disregarded the misleading nature of those statements) in that they contained misrepresentations and failed to disclose material facts concerning the Vesttoo Investment.

72. Specifically, On March 22, 2022, Defendant Frankel, Vice President of Defendant Hanaco, sent Plaintiff's manager solicitation materials which contained extremely misleading material information concerning Vesttoo. This misleading information described Vesttoo as having a "deep investor network," including investors who would receive "alpha returns," including "Retail investors," "HNWI" [high net worth individuals], "Hedge funds," "Pension funds," "Banks," and "Insurers."

73. These statements are false because Vesttoo did not have a "deep investor network." In fact, as described above, Vesttoo's main Financial Investor at the time of Plaintiff's investment was Yu Po. Vesttoo also did not have retail investors, HNWI, hedge funds, pension funds or insurers as Financial Investors, certainly not to the degree that the solicitation materials appear to indicate.

74. The false nature of these statements is more acute when compared to the utter silence of these solicitation materials with respect to key and material issues regarding Vesttoo and its business platform. Nowhere in these materials do Defendants note, let alone describe, and explain the following key facts (non-exhaustive):

(a) The role of Yu Po or other Chinese-based investors in Vesttoo's "success" and/or business model;

(b) The scope of Yu Po's role or other Chinese-based investors in Vesttoo's "success" and/or business model;

(c) The role of CCB in Vesttoo's "success" and/or business model;

(d) The scope of CCB's role in Vesttoo's "success" and/or business model;

(e) The foundational role that LOCs played in Vesttoo's business model (*see* the Report, at 13 ["[…] the LOCs **that were the <u>foundation</u>** of Vesttoo's business were largely illusory."]) (emphasis added);

(f) Any of the red flags, as described in ¶¶61-65.

75. Defendant Hanaco had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff, or, in the alternative, acted with reckless disregard for the truth when it failed to ascertain and disclose the true facts in the statements it or other personnel of Hanaco made to Plaintiff. As alleged, Defendant Hanaco was represented by Romanovski on the board of directors of Vesttoo. Defendant Hanaco and Romanovski either knew of the fraudulent scheme described above or were in a position to investigate and disclose the scheme to Plaintiff, but failed to do so.

76. Moreover, Defendant Hanaco and Romanovski were in a position to describe Vesttoo's business model accurately, but, again, failed to do so. Defendant Hanaco and Romanovski were well aware of the fact (and certainly could and should have been aware) that Vesttoo was relying almost exclusively on Yu Po as its Financial Investor. Hanaco and Romanovski were in a

position to qualify the statement "deep investor network" and other similar statements in Hanaco's solicitation materials. They did not. Instead, they intentionally misled Plaintiff to believe that Vesttoo had a strong, financial future when, in reality, it was just a matter of time before the house of cards would collapse.[5]

---

[5] It should come no surprise that Hanaco, mainly through Romanovski, has resisted this narrative that suggests Hanaco's role/liability in the fraudulent demise of Vesttoo. Upon information and belief, Romanovski, as director of Vesttoo on behalf of the Hanaco investors, has caused the defunct Vesttoo to expend significant funds to generate and publicize an alternative narrative that points fingers at a very narrow group of people and entities (*i.e.*, Yaniv Bartela, Alon Lifshitz, and a number of other Vesttoo employees; Yu Po and CCB for those responsible in Vesttoo's demise. However, in the framework of the bankruptcy proceeding, the Official Committee of Unsecured Creditors have seriously questioned the tendentious nature of the Interim Report:

> Notably absent from these two groups are members of the Debtors' board and management who, even if not directly involved with the fraudulent LOCs, likely failed to fulfill their fiduciary duties, implement and enforce appropriate controls, and detect the fraudulent conduct. After all, in the Debtors words, "red flags abounded as early as 2021." [*Id.* at p. 14]. Thus, the Debtors' management and board, on whose watch the fraud occurred, are obvious investigation subjects and/or targets.

> *Motion of the Official Committee of Unsecured Creditors for Leave to Conduct Discovery Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure Filed by Official Committee of Unsecured Creditors*, *In Re Vesttoo*, 23-11160-MFW, Dkt. no. 132 (Sept. 14. 2023), available **here** (seeking, among other things, discovery and the deposition of Romanovski).

Similar statements by the Debtor's Committee were asserted in a motion filed in October 2023:

> To add insult to injury, the Debtors [Vesttoo and its subsidiaries] made significant unauthorized post-petition payments to professionals and have promoted a narrative that seeks to exonerate current board members and management from liability even though they were directors or executives while the fraud of Bertele, Lifshitz and others occurred. The Committee does not share in this narrative. The Committee is actively investigating claims against those parties that benefitted from the fraud and failed to take actions to stop the harm to creditors from occurring.
> […]
> Notably absent from these two groups are members of the Debtors' **board**, management, **and private equity sponsors**, who, even if not directly involved in the fraud perpetrated by Bertele and other fraudsters, plainly failed to fulfill their fiduciary duties to implement and enforce appropriate controls and detect the fraudulent conduct.
> [emphasis not in original].

The motion, filed on October 22, 2023, can be found **here**.

77. The individual Defendants, Frankel and Prosor, who are senior officers and/or directors and/or managers of Defendant Hanaco, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of Defendant Hanaco to Plaintiff. Frankel and Prosor are senior officers of Hanaco and had access to the same information as Hanaco and their colleague, Romanovski.

78. Had Defendants disclosed these material facts, Plaintiff would have been able to ask additional questions, raise concerns and, ultimately, back out of the failed investment. As a direct and proximate result of Defendants' wrongful conduct, misrepresentations and material omissions, Plaintiff was denied the opportunity to properly evaluate the risks of the investment and make an informed decision about whether to invest.

79. As a direct and proximate result of Defendants wrongful conduct alleged herein, Plaintiff was caused to incur substantial damages in an amount exceeding U.S. $1 million.

**COUNT II**
**FRAUDULENT MISREPRESENTATION**
*as to all Defendants*

80. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

81. Defendants are also liable to Plaintiff for fraudulent misrepresentation in that the Defendants intentionally misled and/or omitted material facts concerning the Vesttoo Investment.

82. Here, in soliciting Plaintiff to make the Vesttoo Investment, Defendants, with intent to deceive Plaintiff and induce it to make the Vesttoo Investment, misrepresented and concealed the material risks associated with the Vesttoo Investment as described above, with the knowledge or belief that the representations were false, or were made with reckless indifference to the truth.

83. Plaintiff justifiably relied upon Defendants' misrepresentations and omissions.

84. But for their misrepresentations and omissions, Plaintiff would not have made the Vesttoo Investment.

85. As a direct and proximate result this fraud, Plaintiff was caused to incur substantial damages in an amount exceeding U.S. $1 million.

## COUNT III
## NEGLIGENCE/GROSS NEGLIGENCE
*as to all Defendants*

86. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

87. Defendants are also liable towards Plaintiff under a negligence/gross negligence theory.

88. Each of the Defendants owed a duty of care, *inter alia*, to conduct a proper due diligence investigation of the risks involved in the Vesttoo Investment and to make **full** disclosure of such risks to Plaintiff prior to accepting the investment.

89. Defendants breached their duty of care by, *inter alia*,

   (a) failing to conduct a proper due diligence investigation of the risks involved in the Vesttoo Investment, including, but not limited to, the viability of Vesttoo's business model, and the role and scope that (1) LOCs, (2) Yu Po, (3) CCB, as well as other third parties, played in Vesttoo's operations; and

   (b) failing to make full disclosure of such risks to Plaintiff prior to accepting the investment;

   (c) failing to detect the fraudulent nature of the Vesttoo business plan;

   (d) failing to investigate the role and scope of Yu Po in Vesttoo's purported success;

   (e) failing to disclose to Plaintiff the foundational role that CCB and Yu Po played in Vesttoo's business model;

(f) failing to disclose to Plaintiff the foundational role that LOCs played in Vesttoo's business model;

(g) failing to exit Vesttoo at a time when Defendant Hanaco's investors could have, at a minimum, covered their losses.

90. This breach not only constituted negligence, but ***gross*** negligence as well because the Defendants were, at a minimum, recklessly uninformed and/or acted outside the bounds of reason, as described above. Had Defendants done even minimal investigative work into the rapid "success" of Vesttoo, they would have discovered what ultimately became one of the biggest fraudulent schemes in this decade. Moreover, had Defendants discharged their duties in a reasonable fashion, they would have disclosed the role and scope that (1) LOCs, (2) Yu Po, (3) CCB, as well as other third parties, played in Vesttoo's operations. In failing to make such elemental disclosures, Defendants failed to exercise even the slightest care or diligence and significantly departed from the standard of care.

91. As a direct and proximate result of Defendants' breach of their duty of care as alleged, Plaintiff was caused to incur substantial damages in an amount exceeding U.S. $1 million.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Requiring Defendants, jointly and severally, to pay damages sustained by Plaintiff by reason of the acts and transactions alleged herein;

B. Awarding Plaintiff prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

C. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY BY TRIAL

Plaintiff hereby demands a trial by jury.

Dated: December 24, 2024

Respectfully submitted,

*/s/ L. Marc Zell*
_____
L. Marc Zell, Esq.
(*pro hac vice to be filed*)
ZELL, ARON & CO.
34 Ben Yehuda St.
14th Floor
Jerusalem, Israel 9423001
011-972-2-633-6300

*Email: mzell@fandz.com*

*/s/ Noam Schreiber*
_____
Noam Schreiber, Esq.
NY Bar. No. 5731971
ZELL, ARON & CO.
34 Ben Yehuda St.
14th Floor
Jerusalem, Israel 9423001
011-972-2-633-6300

*Email: noam.schreiber@fandz.com*

*Counsel for Plaintiff*